## In re BENNER et al.
## Patent Appeal No. 2591.

Court of Customs and Patent Appeals.
Feb. 3, 1931.

Geo. H. Souther, of Niagara Falls, N. Y. (L. Edward Flaherty and J. E. Hutchinson, Jr., both of Washington, D. C., of counsel), for appellants.

T. A. Hostetler, of Washington, D. C., for Commissioner of Patents.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

### LENROOT, Associate Judge.

This is an appeal from the decision of the Board of Appeals of the United States Patent Office affirming the action of the Examiner in rejecting all of the claims of the application of appellants, which claims read as follows:

"1. A storage cell or battery assembly for deferred use comprising dry active electrodes and desiccated separators placed between said electrodes.

"2. A storage cell or battery assembly for deferred use comprising preformed active electrodes and desiccated, treated, wooden separators placed between said electrodes.

"3. A storage battery adapted to be activated by addition of electrolyte and comprising active electrodes assembled with desiccated, treated wooden separators.

"4. The invention according to claim 3, in which the battery is hermetically sealed.

"5. A storage battery capable of rapid activation and comprising active electrodes assembled with desiccated, treated wooden separators characterized by operative electrical conductivity after about three hours' immersion in electrolyte."

The references relied on are as follows: Carpenter, 1,468,259, September 18, 1923, 136–176; Holland et al., 1,329,181, January 27, 1920, 136–176; Handler, 1,546,379, July 21, 1925, 136–150x; Gasche, 1,478,708, December 25, 1923, 136–176.

The application of appellants relates to a combination consisting of dry positive and negative electrodes and desiccated separators between them, which has been charged, thoroughly dried, and sealed before being shipped and stored in the usual manner. The assembly is ineffective in this dry state to function as a battery, but, when it is put into service, it is only necessary to pour into it the required electrolyte. The separators employed are wooden and are especially adapted to retain their effectiveness when in a thoroughly dry condition.

In its discussion of the references the Board of Appeals said: "The patent to Handler describes a separator made up of wood which is intended to be employed in a dry condition and as particularly pointed out it may be artificially dehydrated. Appellant argues that there is a patentable difference between dehydration and dessication: We do not consider that this point is well taken. Appellant also argues that it is not clear that the plates are charged in the Handler patent but on page 2, line 17 is found the statement that the battery is ready for use 'upon adding the electrolyte' which would indicate that the plates had been previously charged. Appellant also seals up the battery after reducing it to a thoroughly dry condition and Handler does not touch upon this point. It is common, however, to seal up batteries under similar conditions as shown in Carpenter. It is true that Carpenter does not refer to thoroughly drying the battery but it is stated that it is thoroughly drained. It is

therefore held that there would be no invention in sealing up the battery of Handler and when this is done it is considered that there is no substantial difference over the battery of Handler in the battery claimed by appellant."

In the specification of the Handler reference there is found the following statement: "It is the object of the present invention to provide a separator which may be stored either by itself or in association with the metal battery element as referred to without the necessity of being kept moist but which may be caused, either by active dehydrating or simply allowing the separator to dry out so as to become dry; that is, its moisture is reduced to the minimum amount consistent with the humidity of the atmosphere in which it is placed. In other words, the condition which is assumed by the body when placed in the atmosphere and without being artificially moistened or wetted."

The specification further states, speaking of the wooden separators: " * * * It is unnecessary, however, to maintain them moist but they may be permitted to dry out or may be artificially dehydrated and then maintained in this dry condition until required for use."

The reason for the drying of the wooden separators, as stated in appellants' specification, is that, without such drying, they are very likely to become cracked and warped and thereby rendered useless; and also, without such drying, the porosity of the separators due to shrinkage is greatly diminished. Appellants contend that there is a patentable difference between dehydrating the wooden separators and desiccating them, and insists that the process of dehydration will still leave some moisture in the separators, but through the process of desiccation all of the moisture is removed therefrom.

According to Webster's Dictionary, "dehydrate" means "to deprive, or to be free, of

water or the elements of water; to render free from water." The same authority defines the word "desiccate" as meaning "to exhaust or remove the moisture from—dry thoroughly, especially to free from moisture with a view to preserving."

Funk & Wagnalls' Standard Dictionary defines "dehydrate" as meaning: "I. To deprive of water; anhydrate. II. To suffer loss of water"—while the same authority defines "desiccate" as meaning: "I. To exhaust or remove the moisture from; dry thoroughly; especially, to free from moisture with a view to preserving; as, desiccated fish or beef. * * * II. To become dry (de, thoroughly, + siccus, dry.)"

As will be noted from the quotation given, the Board of Appeals found that there was no patentable difference between dehydration and desiccation.

We think that both Handler and appellants had exactly the same thing in mind, namely, the removal of moisture from the wooden separators, and that a process of dehydration, as disclosed by Handler, if carried out completely, will result in the desiccation of the wooden separators claimed by appellant. It is this element of desiccation which appellants contend renders the claims allowable.

Claim 4 contains the additional element of hermetically sealing the battery after the elements set out in appellants' specification have been assembled. The Board of Appeals found that it is common to seal up batteries under similar conditions, as shown in the Carpenter reference. We agree with the Board that there would be no invention in sealing up the battery of Handler, and that, when this is done, there is no substantial difference over the battery of Handler in the battery claimed by appellants.

The decision of the Board of Appeals is affirmed.

Affirmed.